SARAH E. BARROWS (SBN 253278)
barrowss@gtlaw.com
GREENBERG TRAURIG, LLP
Four Embarcadero Center, Suite 3000
San Francisco, CA 94111
Telephone: (415) 655-1300
Facsimile: (415) 707-2010

*Attorneys for Defendant and Counterclaimant*
GMI USA CORPORPORATION

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ROCKET DOG BRANDS, LLC, a Delaware limited liability company,<br><br>     Plaintiff,<br><br>v.<br><br>GMI CORPORATION, a new York corporation,<br><br>     Defendants. | CASE NO. 3:12-cv-04643-SI<br><br>**GMI USA CORPORATION'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: August 16, 2013<br>Time: 9:00 a.m.<br>Courtroom: 10, 19th Floor |

**TO ALL PARTIES AND TO THEIR RESPECTIVE ATTORNEYS OF RECORD**:

**PLEASE TAKE NOTICE** that on August 16, 2013 at 9:00 a.m., or as soon thereafter as the matter may be heard in Courtroom 10 – Nineteenth Floor of the above-entitled court, located at 450 Golden Gate Avenue, San Francisco, California, Defendant GMI USA Corp. ("GMI") will, and hereby does, move this Court for an order, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment dismissing all of Plaintiff Rocket Dog Brands, LLC's ("Rocket Dog") complaint.

This motion for summary judgment is based upon this Notice, the accompanying Memorandum of Points and Authorities, the Declaration of Sarah E. Barrows, supporting appendices of exhibits, the pleadings and records on file in this action, and such additional argument and evidence as may be presented in connection with this matter.

DATED:   July 12, 2013                    GREENBERG TRAURIG, LLP
                                          By:   /s/ Sarah E. Barrows
                                          SARAH E. BARROWS (SBN 253278)
                                          barrowss@gtlaw.com
                                          GREENBERG TRAURIG, LLP
                                          4 Embarcadero Center, Suite 3000
                                          San Francisco, CA 94111-5983
                                          Tel: (415) 655-1300
                                          Fax: (415) 707-2010

                                          *Attorneys for Defendant*
                                          **GMI USA CORPORATION**

# **TABLE OF CONTENTS**

Preliminary Statement.................................................................................................1

Background and Statement of Undisputed Facts ................................................2

    I.     THE PARTIES...........................................................................................2

    II.    THE AGREEMENT ................................................................................3

    III.   THE AMENDMENT ...............................................................................4

    IV.   GMI'S ROYALTY PAYMENTS TO ROCKET DOG OF $128,000 ...................4

Legal Standard ......................................................................................................6

Argument ..............................................................................................................6

    I.     THE ACCELERATED ROYALTIES PROVISION IS NEITHER
         IMPLICATED NOR ENFORCEABLE UNDER CALIFORNIA LAW,
         AND THUS ROCKET DOG HAS NO BASIS IN FACT OR LAW FOR
         DAMAGES THEREUNDER .......................................................................6

         A.     The Accelerated Royalties Provision Was Never Triggered .......................7

         B.     The Accelerated Royalties Provision Is an Unenforceable Penalty............9

         C.     The Advertising Expenditures are a Red Herring......................................12

    II.    ROCKET DOG IS ALSO PRECLUDED FROM OBTAINING ANY
         DAMAGES BY OPERATION OF SECTION 11.2 OF THE
         AGREEMENT .......................................................................................13

Conclusion ...........................................................................................................16

# **TABLE OF AUTHORITIES**

## **Cases**

*Altel Financial Corporation v. Quaker Coal Co.*,
   132 F. Supp. 2d 1233 (N.D. Cal. 2001) ........................................................10, 11

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ...............................................................................................5

*Baypoint Mortgage v. Crest Premium Real Estate Investments Retirement Trust*,
   168 Cal. App. 3d 818 (Cal. Ct. App. 1985) ..........................................................10

*Blankenheim v. E.F. Hutton & Co., Inc.*,
   217 Cal. App. 3d 1463 (Cal. Ct. App. 1990) ........................................................13

*Caza Drilling (California), Inc. v. TEG Oil & Gas U.S.A., Inc.*,
   142 Cal. App. 4th 453 (Cal. Ct. App. 2006) ...................................................13, 14

*City of Pasadena v. AT&T Commc'ns*,
   103 Cal. App. 4th 981 (Cal. Ct. App. 2002) ..........................................................8

*Civic Center Drive Apartments Ltd. P'ship v. S.W. Bell Video Services*,
   295 F. Supp. 2d 1091 (N.D. Cal. 2003) ................................................................13

*Garrett v. Coast & Southern Fed. Sav. & Loan Assn.*,
   9 Cal. 3d 731 (1973) ....................................................................................9, 10, 11

*Greentree Fin. Group, Inc. v. Execute Sports, Inc.*,
   163 Cal. App. 4th 495 (Cal. Ct. App. 2008) .........................................................10

*Nicoletti v. Bank of Los Banos*,
   190 Cal. 637 (1923) ................................................................................................8

*Reserve Ins. Co. v. Pisciotta*,
   30 Cal. 3d 800 (1982) ...........................................................................................13

*Ridgley v. Topa Thrift and Loan Ass'n*,
   17 Cal. 4th 970 (1998) ............................................................................................9

*Sybron Corp. v. Clark Hospital Supply Corp.*,
   76 Cal. App. 3d 896 (Cal. Ct. App. 1978) ............................................................10

*Tunkl v. Regents of University of California*,
   60 Cal. 2d 92 (1963) .............................................................................................13

*United Guaranty Mortg. Indem. Co. v. Countrywide Fin. Corp.*,
   660 F. Supp. 2d 1163 (C.D. Cal. 2009) ...............................................................13

*United States v. King Features Entm't*,
   843 F.2d 394 (9th Cir. 1988) ..................................................................................5

## **Statutes**

Civil Code § 1668 ............................................................................................................13

Civil Code § 1671(b) .........................................................................................................9

## **Rules**

Fed. R. Civ. P. 56(c) ..........................................................................................................5

# MEMORANDUM OF POINTS AND AUTHORITIES

## PRELIMINARY STATEMENT

This is a breach of license agreement action that largely turns on the express terms of that agreement. Although the action is in its early stages, the undisputed facts and the clear and unambiguous provisions of the license agreement and the amendment thereto make clear that the parties' agreed to waive any liability resulting in contract damages in connection with their performance under the agreement, and in general permitted one lone remedy, termination of the agreement. Rocket Dog elected termination on June 21, 2012, not quite half way through the second year of contract term. Before terminating, Rocket Dog attempted to take unfair advantage of a payment on April 30, 2012 that it alleges was untimely in order to invoke a provision that calls for the acceleration of unpaid royalties for two years in the event of a default in payment of scheduled royalty payments.

The undisputed facts, however, readily demonstrate that there was no such default. GMI had previously paid Rocket Dog sufficient royalties so as to carry a positive balance on its royalty payment obligations. Thus, even if GMI had made no payment by the deadline of April 30, 2012, the balance would have been more than sufficient to cover any required payment, and GMI would not have been in default.

But, GMI actually did make the payment on April 30, 2012. Bank records indisputably demonstrate that on April 30, 2012 it wired $78,000 to Rocket Dog, far in excess of the then required payment of $17,500. Even if, as Rocket Dog maintains, the wired funds did not reach Rocket Dog's account until several hours later on the following day, that is of no moment. GMI was not obligated by the parties' contract or California law to ensure that Rocket Dog received the payment by the deadline. All it had to do was timely remit the payment, which it did through an international financial institution.

Even assuming *arguendo* that payment was somehow untimely, Rocket Dog's interpretation of the accelerated royalties provision is unenforceable because it results in a payment of $680,000 that is so utterly disproportionate to whatever *de minimis* damages Rocket Dog would have suffered (if any) by having to wait only hours to receive payment. That is

clearly a penalty that is impermissible under well-established California law. Previous examples that the courts have found to be unlawful pale in comparison to the penalty Rocket Dog seeks to impose for (at worst) the slight annoyance of waiting a few hours to receive payment. Nor is there any basis for Rocket Dog's alternative basis for invoking the acceleration provision, a purported default with respect to advertising expenditures. By its plain terms the acceleration provision is not triggered by, and in fact has no connection with, the separate issue of advertising expenditures. Rocket Dog's effort to rewrite the plain meaning of the contract fails.

Finally, Rocket Dog's numerous allegations of other various violations of the licensing agreement by GMI are nothing but extra noise that serve as further pretext for Rocket Dog's termination of the agreement. Rocket Dog cannot recover damages even if it could establish any breach, because the parties' agreement unambiguously and prominently states that "<u>under no circumstances whatsoever will the parties be liable to each other for… damages… arising from its performance or non-performance pursuant to any provision of this agreement</u>." (emphasis added). California law generally respects parties' ability to allocate their risks as they please by agreement, and the Court should honor the bargain the parties struck here and dismiss Rocket Dog's damages claims.

The enforceability of the waiver of damages and accelerated royalty provisions of the agreement are significant matters of law that can be resolved on the limited undisputed facts to date. Resolution of these issues should meaningfully shift the landscape of this case and narrow or eliminate the need for discovery going forward.[1]

## BACKGROUND AND STATEMENT OF UNDISPUTED FACTS

### I.    THE PARTIES

Rocket Dog is a footwear company with product lines in casual, dress, sport, sandals, flats, slippers, and boots. GMI is a footwear design, distribution, and licensing company founded in 2005.

---

[1] GMI has contemporaneously filed a separate motion for a stay of discovery pending the Court's ruling on this motion for summary judgment.

## II.  THE AGREEMENT

Pursuant to an October 1, 2010 Rocket Dog Brands Licensing and Distribution Agreement (hereinafter the "Agreement"), GMI was appointed "exclusive distributor" of men's and children's footwear bearing licensed Rocket Dog's trademarks.  A true and correct copy of the Agreement is attached hereto as Exhibit A to the contemporaneously filed Declaration of Stefano Maroni (hereinafter the "Maroni Decl.").   The essential function of the Agreement was to allow GMI to design, produce, and sell men's and children's shoes bearing the Rocket Dog insignia.  (*See* Agreement at § 2, Maroni Decl. Ex. A).

In exchange for use of Rocket Dog trademarks, GMI was to pay Rocket Dog certain royalties, either as a percentage of sales or as a minimum royalty if specified sales thresholds were not achieved.  (*See id.* at § 5).  Based on anticipated "minimum sales," the minimum royalty for the first year of the term of the agreement (2011) was $200,000, and $680,000 for the second year (2012).  (*See id.* at § 5.1 and Ex. B thereto).[2]  The Agreement generally provides that each year's royalty was to be paid in periodic increments, generally "on a quarterly basis and will be due and payable no later than 30 days following the end of each calendar quarter during the Term . . . ."  (*Id.* at § 5.1(a)).

As alleged in the Counterclaims, Rocket Dog's misconduct, however, derailed GMI's ability to achieve these minimum sales.  Soon after entering the Agreement, Rocked Dog launched its own line of products, "K-9 by Rocket Dog," a lower cost product line that directly competed with the products GMI was selling pursuant to the Agreement. GMI could not fairly compete with this new product line because GMI was held to quality standards that entailed greater production costs.  Retailers began demanding lower prices based on these lower-priced similar products, and GMI began losing money on its efforts.  Rocket Dog also ensured a competitive edge for its own products by barring GMI from selling its products directly over the Internet and by not placing GMI products for sale on the Rocket Dog website.  Further, Rocket Dog permitted a former licensee to continue to sell similar inferior products in the marketplace,

---

[2] The term "Minimum Royalties" is defined in the Agreement to mean "8% of Minimum Sales," with "Minimum Sales" being set forth in Table 1 in Exhibit B to the Agreement.  (Agreement at §§ 1.10 & 1.11, Maroni Decl. Ex. A).

yet more intra-brand competition for GMI, even though GMI was Rocket Dog's "exclusive distributor." These and other forms of misconduct by Rocket Dog are the bases of GMI's counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, unfair competition, and interference with prospective economic advantage.[3]

## III. THE AMENDMENT

Even with Rocket Dog undermining GMI's performance, GMI still timely paid all royalties it owed Rocket Dog under the Agreement. On November 22, 2011, the parties agreed to amend the terms of the Agreement, including the royalty structure, by entering into an Amendment to Rocket Dog Brands Licensing and Distribution Agreement (the "Amendment"). (*See* Amendment, Maroni Decl. Ex. B). Among other things, the Amendment lowered certain royalty amounts, but also introduced an accelerated royalties provision (the "Accelerated Royalties Provision"). (*Id.*). Pursuant to the Accelerated Royalties Provision,

> [i]n the event of any default in the timing of or otherwise regarding any of Distributor's payment obligations in the first year of the Term or the second year of the Term, Rocket Dog Brands may, without notice or demand, declare the entire aggregate Minimum Royalties for the first year and second year of the Term then unpaid immediately due and payable.

(*Id.* at § 3.1(iii)).

In other words, under this provision, combined with Section 5.1(a) and the new payment due dates expressly set forth in the Amendment, incremental payments of the total annual Minimum Royalty were not due, except as expressly specified, or if GMI defaulted in making a payment.

## IV. GMI'S ROYALTY PAYMENTS TO ROCKET DOG OF $128,000

As mentioned, GMI timely paid all royalties it owed Rocket Dog.[4] Specifically, GMI made three royalty payments prior to Rocket Dog's termination of the Agreement in June 2012. GMI made its first payment in October 2010, at execution of the Agreement, when it paid "Initial Fees" in the amount of $38,000. (*See* Agreement at § 5.2, Maroni Decl. Ex. A). Of that

---

[3] GMI is not seeking summary judgment on its counterclaims against Rocket Dog in this motion.

[4] For a detailed accounting of these payments and balances, *see* Declaration of Sarah E. Barrows, Ex. 1 ("Barrows Decl.").

$38,000, "[a]n amount equal to $28,000... is a non-refundable prepayment of royalties due from Distributor to Rocket Dog Brands and will be offset against the first $28,000 of royalties that would otherwise be due hereunder." (*Id.*; *see also* Amendment at § 3.1(i)(1), Maroni Decl. Ex. B (acknowledging and agreeing that GMI had already paid royalties in the sum of $28,000)). Accordingly, from inception of the Agreement, there existed a positive balance of $28,000 toward payment of the Minimum Royalty owed Rocket Dog.

GMI made its second payment on November 22, 2011, at execution of the Amendment, in the amount of $22,000. That payment was applied to GMI's Minimum Royalty obligation to Rocket Dog for the first six months of the term of the Agreement (from January 2011 through June 2011). (*See* Amendment at § 3.1(i)(1), Maroni Decl. Ex. B). The Amendment confirms that said payment was "[f]or the period from January 1, 2011 through June 30, 2011...." (*Id.*).

GMI made its third payment on April 30, 2012, by wire transfer in the amount of $78,000, well in excess of the royalty amount owed. (*See* Wire Confirmation, Maroni Decl. Ex. C). Under the Amendment, GMI's third royalty payment was "[f]or the period from July 1, 2011 through September 30, 2011," and GMI had "the right to extend the payment of these amounts owed as of October 31, 2011 up through April 30, 2012." (Amendment at § 3.1(i)(2), Maroni Decl. Ex. B). Thus, by making this payment on April 30, 2012, GMI satisfied its contractual obligation. All told, GMI paid royalties of $128,000 to Rocket Dog.

Only a few days later, though, and notwithstanding its having received and accepted the April 30 payment, on May 4, 2012, Rocket Dog declared GMI to be in default of various obligations under the Agreement. Among other things, Rocket Dog demanded, on the pretext that GMI's April 30 payment was not timely, immediate payment of the entire aggregate Minimum Royalties under the Amendment's Accelerated Royalties Provision. (*See* May 4, 2012 Letter, Maroni Decl. Ex. D). The parties corresponded on these matters, each side claiming the other was in breach, but they reached no resolution. (*See*, *e.g.*, May 29, 2012 Letter, Marconi Decl. Ex. E). Thereafter Rocket Dog unilaterally terminated the agreement as of June 21, 2012, less than six months into Year Two of the Agreement. (*See* June 21, 2012 Letter, Maroni Decl. Ex. F). GMI responded to the termination by reiterating Rocket Dog's breaches of the

1  Agreement.  (*See* June 26, 2012 Letter, Maroni Decl. Ex. G.)  Rocket Dog then initiated this

2  lawsuit.

3  Because these facts are uncontested and the parties only have a dispute about the legal

4  significance of the facts, this matter is ripe for partial summary judgment.

5  ## LEGAL STANDARD

6  Summary judgment is appropriate where no genuine dispute exists as to any issue of

7  material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

8  56(c).  Once the moving party has made a showing that this standard is met, the burden shifts to

9  the party opposing summary judgment to demonstrate that there is a genuine issue for trial.

10  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Summary judgment on the meaning

11  of the terms of a contract is appropriate where the contract terms are clear and unambiguous,

12  even if the parties disagree as to their meaning.  *United States v. King Features Entm't*, 843 F.2d

13  394, 398 (9th Cir. 1988).  Interpretation of a contract is a matter of law, including whether the

14  contract is ambiguous.  *Id.*

15  ## ARGUMENT

16  ## I.  THE ACCELERATED ROYALTIES PROVISION IS NEITHER IMPLICATED
17  ## NOR ENFORCEABLE UNDER CALIFORNIA LAW, AND THUS ROCKET DOG
   ## HAS NO BASIS IN FACT OR LAW FOR DAMAGES THEREUNDER

18  The vast majority of Rocket Dog's alleged damages—$680,000—stem from an alleged

19  trigger of the Accelerated Royalties Provision under the Amendment to the Agreement.  This is

20  confirmed by Rocket Dog's Initial Disclosures showing that over seventy-five percent of its total

21  damages of $880,000 are the $680,000 allegedly owed for the 2012 minimum royalties.

22  (Barrows Decl., Ex. 2 at 4).  When Rocket Dog made its initial claim that GMI was in default

23  and triggered the Accelerated Royalties Provision on May 4, 2012, royalties for calendar year

24  2012 were not yet due—indeed, nearly eight months still remained for the calendar year of 2012.

25  Rocket Dog's sole claim to 2012 royalties is pursuant to the Accelerated Royalties Provision,

26  Section 3.1(iii) of the Amendment.  But, as set forth below, Rocket Dog's demand of damages

27  under this provision has no factual, contractual, or legal basis, and in any event is unenforceable

28  under California law as a penalty.

## A.    The Accelerated Royalties Provision Was Never Triggered

The accelerated royalty provision is triggered only "[i]n the event of any default in the timing of or otherwise regarding any of Distributor's payment obligations," at which time Rocket Dog may declare the entire minimum royalty due.  (Amendment at § 3.1(iii), Maroni Decl. Ex. B).  Thus, only a failure to make timely royalty payments could invoke the accelerated royalty clause.  The undisputed facts show that GMI made all royalty payments required of it under the Agreement and the Amendment, and in fact it exceeded those obligations.

### 1.    GMI Timely Made the April 30 Payment

Rocket Dog's claim of late payment concerns only the payment purportedly due on April 30, 2012.  In its letter declaring GMI in default, Rocket Dog identified only that one royalty payment as untimely.  (*See* June 21, 2012 Letter at 2, Maroni Decl. Ex. F).  Rocket Dog, however, ignores the plain facts that GMI did not make untimely payments because it made its royalty payment on the due date of April 30, 2012.

Bank records confirm that GMI wired $78,000 to Rocket Dog through Chase Bank at 4:45 p.m. on April 30, 2012.  (*See* Wire Confirmation, Maroni Decl. Ex. C).  This amount far exceeds the $17,500 minimum royalty amount owed for that quarter, even setting aside that that amount was already covered by a credit balance.  There is simply no factual basis to Rocket Dog's claim that payment was not timely made on April 30, 2012.

Rocket Dog instead bases its breach of contract claim on the premise that because the funds were purportedly not deposited into its account until the following day, Rocket Dog's payment was not timely.  In addition to lacking factual support, this position is not supported by the parties' agreements or the law.  The relevant contractual language makes clear that GMI's obligation was fulfilled on April 30, 2012 when it sent the wire transfer.  Section 3.1(i)(2) of the Amendment, which specifically governs the payment at issue, requires that "Distributor [GMI] shall *pay*" and "Distributor shall have the right to extend *the payment* of these amounts owed as of October 31, 2011 up through April 30, 2012."  (Amendment § 3.1(i)(2), Maroni Decl. Ex. B (emphasis added)).  That is precisely what happened.  Even assuming Rocket Dog did not receive the funds in its account until a few hours later on the following day, that is of no

moment. The plain language of the Amendment unambiguously obligates and specifies when an act of "payment" must take place; it is not based on receipt by Rocket Dog.

This is also fully consistent with California case law addressing the use of language in contracts and statutes setting a deadline for the act of payment itself (not when payment is received). *See City of Pasadena v. AT&T Commc'ns*, 103 Cal. App. 4th 981, 985 (Cal. Ct. App. 2002) (interpreting a city tax ordinance using "remit" to mean that taxpayer's obligation is complete at time payment is sent; "'Remit' means 'send.' Remit does not mean 'receive,' the antonym of 'send'"); *see also Nicoletti v. Bank of Los Banos*, 190 Cal. 637, 640 (1923) (finding that bank that agreed to "remit" money to plaintiff's mother in Italy was not responsible when money was claimed by wrong person; the agreement was only to send the money and not to ensure delivery). GMI thus timely paid and complied with its obligations. That Rocket Dog claims it did not receive payment until the following day is immaterial, and does not constitute a breach of any payment obligation.

### 2.    GMI Had a Credit Covering the Minimum Royalty Due on April 30, 2012

Even assuming the April 30 payment was somehow ineffective under the Agreement, GMI had a positive Minimum Royalty balance as of that date. As detailed above, GMI had a positive balance of $22,000 in Minimum Royalty payments after making its first two payments to Rocket Dog. In particular, under the terms of the Amendment, "[f]or the period from January 1, 2011 through June 30, 2011 [*i.e.*, the first half of 2011], Distributor [GMI] shall pay… twenty-five (25) percent of the pro-rata portion of the Minimum Royalties for the year." (Amendment at § 3.1(i)(1), Maroni Decl. Ex. B). Because the Minimum Sales for 2011 were $2.5 million, (*id.* at Ex. B to the Amendment), the Minimum Royalties for that year were $200,000 ($2.5 million times 8%). The pro-rata portion for the first half of 2011 was thus $100,000, and twenty-five percent thereof was $25,000. That was the amount GMI was required to pay Rocket Dog for the first half of 2011.

As discussed, and as acknowledged in the Amendment, however, GMI had already paid $28,000. (*Id.* at § 3.1(i)(1)(a)). Moreover, rather than pay the royalty of $25,000 that was then

due, GMI "agree[d] to pay the additional sum of $22,000 (U.S.) immediately upon the execution of this Amendment." (*Id.* at § 3.1(i)(1)(b)). Accordingly, at the point of the Amendment, GMI had paid Rocket Dog $50,000, and its positive Minimum Royalties balance was reduced – from $28,000 to $25,000 – to account for the $3,000 still owing after its royalty payment in the partial amount of $22,000.

GMI carried this balance of $22,000 through April 30, 2012, the due date for its next royalty payment, "[f]or the period from July 1, 2011 through September 30, 2011" – the third quarter of 2011. (*Id.* at § 3.1(i)(2)). The Amendment specified that the amount of that payment was "the greater of eight (8) percent of Net Sales or thirty-five (35) percent of the pro-rata portion of the Minimum Royalties for the year…." (*Id.*). The latter formulation resulted in the higher number, and was thus employed. Again, the Minimum Royalties for 2011 were $200,000, and the pro-rata portion for the third quarter was $50,000. Thirty-five percent of $50,000 calculates out to $17,500, and was thus the amount GMI was required to pay Rocket Dog on April 30, 2012.

As discussed, as of that date GMI had an outstanding credit of $25,000 towards royalties as a result of royalty overpayments – the $28,000 initial payment and the $22,000 payment in November 2011 against the $25,000 owed in November 2011.[5] GMI thus carried a $25,000 positive balance for royalty payments. Accordingly, even if GMI had made no payment when the successive (third) quarter 2011 royalty payment was due on April 30, 2012, GMI still would have been $7,500 ahead of its minimum royalty obligations (*i.e.*, the $25,000 balance minus $17,500). There was no default under these circumstances.

### B. The Accelerated Royalties Provision Is an Unenforceable Penalty

Even if GMI's payment had been late (which it was not), and there had been no positive balance at the time (there was such a balance), Rocket Dog's draconian attempt to accelerate royalty payments in the amount of $680,000 would still be unavailing because its interpretation of the Amendment's accelerated royalties provision makes it an unenforceable penalty under

---

[5] In the Amendment, the parties acknowledged that GMI had paid $50,000 in royalty payments for the first two quarters of 2011, an amount $25,000 in excess of the minimum royalty payment owed to that point. (*See id.* at § 3.1(i)(1)). For a schedule detailing the payment and balance amounts, *see* (Barrows Decl., Ex. 1).

California law.  Rocket Dog's demand for the accelerated royalty payment in the event of a one-day late payment is grossly out of proportion to whatever mild inconvenience it may have suffered.

California law has long disapproved of liquidated damages provisions aimed at coercing timely payment under a contract.  Civil Code § 1671(b) expressly states that such clauses are unenforceable if "the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made."  That showing of unreasonableness is readily made in this case because the penalty imposed by the Accelerated Royalties Provision bears no reasonable relationship to the range of actual damages anticipated and is clearly an unenforceable penalty under the law.

The California Supreme Court has explained the critical relationship between a liquidated damages clause and the actual damages anticipated by the parties necessary to enforce such a provision:

> [a] liquidated damages clause will generally be considered unreasonable, and hence unenforceable under section 1671(b), if it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach. The amount set as liquidated damages "must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained."…. In the absence of such relationship, a contractual clause purporting to predetermine damages "must be construed as a penalty." "A penalty provision operates to compel performance of an act… and usually becomes effective only in the event of default… upon which a forfeiture is compelled without regard to the damages sustained by the party aggrieved by the breach…. The characteristic feature of a penalty is its lack of proportional relation to the damages which may actually flow from failure to perform under a contract."

*Ridgley v. Topa Thrift and Loan Ass'n*, 17 Cal. 4th 970, 977 (1998) (quoting *Garrett v. Coast & Southern Fed. Sav. & Loan Assn.*, 9 Cal. 3d 731, 739 (1973)).

Consistent with these principles, California courts have repeatedly rejected liquidated damages provisions that are disproportionate to the actual damages suffered as unenforceable penalties.  *See, e.g., Garrett*, 9 Cal. 3d at 740 ("We are compelled to conclude that a charge for the late payment of a loan installment which is measured against the unpaid balance of the loan must be deemed to be punitive in character."); *Greentree Fin. Group, Inc. v. Execute Sports, Inc.*, 163 Cal. App. 4th 495, 501 (Cal. Ct. App. 2008) ("The stipulated judgment of $61,232.50

would result in a penalty assessment of approximately $40,000 more than the total $20,000 due under the stipulation. A late payment penalty fee of approximately $40,000 bears no reasonable relationship to any actual damages that might flow from ESI's failure to make the first installment payment."); *Baypoint Mortgage v. Crest Premium Real Estate Investments Retirement Trust*, 168 Cal. App. 3d 818, 829-30 (Cal. Ct. App. 1985) (holding provision allowing lender to foreclose because of late installment payments was unenforceable as penalty or forfeiture); *Sybron Corp. v. Clark Hospital Supply Corp.,* 76 Cal. App. 3d 896 (Cal. Ct. App. 1978) (finding that liquidated damages of $100,000 for late payment on $30,000 balance was an unenforceable penalty that "bears no reasonable relationship to actual damages suffered by respondent as the result of delay but to the contrary appears grossly disproportionate in amount").

Similarly, in *Altel Financial Corporation v. Quaker Coal Co.*, 132 F. Supp. 2d 1233, 1241 (N.D. Cal. 2001), the District Court found a liquidated damages formula "requiring a defaulting lessee to pay the present value of all monies to be paid by lessee during the remaining term of the lease, plus the anticipated residual value of the equipment" was unenforceable under California law because implementation of the formula "would multiply Altel's likely actual damages many times over."

The situation here is far more punitive and disproportionate than in the above-cited cases. Here, Rocket Dog's damages from an alleged one-day (a few hours) delay in payment would have been *de minimis*, if anything. Under no circumstances could an alleged one-day delay in payment justify accelerating royalties for a two-year period, resulting in a $680,000 penalty. Such a massive charge would bear no "proportional relation to the damages which may actually flow from failure to perform under a contract" and would clearly be a penalty. *Garrett*, 9 Cal. 3d at 739. The liquidated damages Rocket Dog seeks would dwarf the penalty the District Court found unenforceable in *Altel* because it "would multiply [plaintiff's] likely actual damages many times over." 132 F. Supp. 2d at 1241. Here, $680,000 would be imposed for *no* discernible damages and would act as a windfall for Rocket Dog, which terminated the Agreement before the end of the second quarter of 2012. Such a liquidated damage is patently impermissible and

unenforceable under California law.  Rocket Dog's insistence on its position only underscores the improper advantage it is trying to take of GMI.

### C. Rocket Dog's Claim of Accelerated Entitlement to Advertising Expenditures Is Unsupported In the Agreement and Another Example of Its Overreaching

Perhaps in recognition that its "late payment" claim does not stand up to any scrutiny, Rocket Dog has also argued that it is entitled to invoke the Accelerated Royalties Provision on the basis of GMI's alleged failure to pay Rocket Dog purportedly owed advertising expenditures. But by the plain terms of the Agreement, those two provisions do not relate.  This position is yet another overreach by Rocket Dog without any support.  In fact, although Rocket Dog's complaint discusses the Accelerated Royalties Provision and alleges deficiencies in advertising expenditures, it never connects the two or suggests they are related in any way.

Rocket Dog ignores that the Amendment's Accelerated Royalties Provision is expressly limited to royalties payments, and has nothing to do with advertising expenditures.  Indeed, the Amendment is concerned solely with the royalty payments.  The Accelerated Royalties Provision is located in Section 3.1 of the Amendment, which states it is "modif[ying]" "Section 5.1(b) of the Original Agreement… so that it reads in its entirety as set forth below."  (Amendment at § 3.1, Maroni Decl. Ex. B).  Moreover, both Section 5 of the Agreement and Section 3 of the Amendment concern solely royalties, as reflecting their shared heading:  "ROYALTIES."  The Amendment expressly states the rest of the original Agreement – including any obligation relating to advertising – is untouched and unaffected by the Amendment.  (*See id.* at § 3.2 ("For clarity, except as expressly stated in this Section 3 of this Amendment, all payment obligations and all other obligations of Distributor under the Original Agreement are unaffected by this Amendment and remain as stated in the Original.")).

There is simply no connection between the Accelerated Royalties Provision and any non-royalty obligation, and thus no basis to imply any such connection.  *Accord Series AGI West Linn of Appian Group Investors DE LLC v. Eves*, 217 Cal. App. 4th 156, 158 Cal. Rptr. 3d 193, 200 (Cal. Ct. App. 2013) ("[C]ourts assume that each party to a contract is alert to, and able to protect, his or her own best interests.  Therefore, courts will not rewrite contracts to relieve

parties from bad deals nor make better deals for parties than they negotiated for themselves.").
*See also Hyundai America, Inc. v. Meissner & Wurst GmbH & Co.*, 26 F. Supp. 2d 1217, 1220 (N.D. Cal. 1998) ("Courts interpret contracts as made by the parties and do not make new ones for them.")

In any event, as discussed above, even if obligations with respect to advertising expenditures could somehow trigger the Accelerated Royalties Provision, the $680,000 penalty is wildly disproportionate to any purported damage suffered by any alleged late payment of the 2011 advertising expenditures owed is again an unenforceable penalty.[6]

## II. ROCKET DOG IS ALSO PRECLUDED FROM OBTAINING ANY DAMAGES BY OPERATION OF SECTION 11.2 OF THE AGREEMENT

While the alleged damages claimed by Rocket Dog consist mostly of Rocket Dog's attempt to invoke the Accelerated Royalties Provision, Rocket Dog has also alleged a host of other breaches in an "everything-but-the-kitchen-sink" approach to obtaining an award of damages outside the Accelerated Royalties Provision. Rocket Dog's blatant overreach should be cut off at this stage, because the clear and unambiguous terms of the Agreement preclude any damages claims for any additional purported breaches. The Agreement makes it clear that the remedy for any of these various breaches was limited to termination of the Agreement (which is what Rocket Dog elected), without any entitlement to money damages. Rocket Dog cannot have it both ways.

Section 11.2 of the Agreement states:

EXCEPT AS PROVIDED IN THIS AGREEMENT IN CONNECTION WITH ANY OBLIGATIONS RELATING TO INSURANCE, DEFENSE, OR INDEMNIFICATION, <u>UNDER NO CIRCUMSTANCES WHATSOEVER WILL THE PARTIES BE LIABLE TO EACH OTHER FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY, PUNITIVE, OR OTHER FORM OF DAMAGES (EVEN IF SUCH DAMAGES ARE FORESEEABLE OR A PARTY HAS BEEN ADVISED OR HAS CONSTRUCTIVE KNOWLEDGE OF THE POSSIBILITY OF SUCH DAMAGES) ARISING FROM ITS PERFORMANCE OR</u>

---

[6] This is especially true given that any such deficiency for calendar year 2011 would have been no more than $50,000. (*See* Agreement at § 4.4, Maroni Decl. Ex. A (providing that the advertising expenditure for 2011 is "not less than 2% of the Minimum Sales for that year")). The Minimum Sales for 2011 was $2.5 million, 2% of which is $50,000. As for 2012, the minimum amount to be spent on advertising for that year was to be "not less than 2% of Net Sales in the [sic] that year." (*Id*.). At the time Rocket Dog terminated the Agreement, 2012 Net Sales to date were $647,209.80, (Maroni Decl. ¶ 8), so the most Rocket Dog could claim for 2012 would be $12,944.20 (2% of pro-rated Net Sales) minus GMI's actual advertising expenditures.

NON-PERFORMANCE PURSUANT TO ANY PROVISION OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION LOSS OF REVENUE OR ANTICIPATED PROFITS OR LOST BUSINESS REGARDLESS OF WHETHER ANY CLAIM TO SUCH DAMAGES SOUNDS IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY), PRODUCT LIABILITY, INFRINGEMENT OF INTELLECTUAL PROPERTY OR PROPRIETARY RIGHTS, OR OTHER CAUSE OF ACTION.

(Agreement at § 11.2, Maroni Decl. Ex. A (emphasis added)).

Provisions limiting or precluding damages are generally enforceable under California law. *See, e.g.*, *Civic Center Drive Apartments Ltd. P'ship v. S.W. Bell Video Services*, 295 F. Supp. 2d 1091, 1105-06 (N.D. Cal. 2003) ("Generally, provisions limiting liability in construction contracts are enforceable under California law so long as the parties negotiated and expressly agreed to the limitations."). "As a matter of contractual interpretation, there is nothing to hinder a 'voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party.'" *Caza Drilling (California), Inc. v. TEG Oil & Gas U.S.A., Inc.*, 142 Cal. App. 4th 453, 467 (Cal. Ct. App. 2006) (quoting *Tunkl v. Regents of University of California*, 60 Cal. 2d 92, 101 (1963)). Accordingly, "[i]t is axiomatic that absent a violation of public policy, a statute, or a constitutional provision, the parties to a private agreement may allocate risks in any manner they may choose." *United Guaranty Mortg. Indem. Co. v. Countrywide Fin. Corp.*, 660 F. Supp. 2d 1163, 1185 (C.D. Cal. 2009) (quoting *Reserve Ins. Co. v. Pisciotta*, 30 Cal. 3d 800, 814 (1982)).

As shown by the plain language of Section 11.2, the parties agreed that "under no circumstances whatsoever" would any party to the Agreement be liable to the other for damages "arising from its performance or non-performance pursuant to any provision of this Agreement," regardless of the basis of any claim. (Agreement at § 11.2, Maroni Decl. Ex. A). [7] The parties also made plain in their Agreement that the only available remedy in the event of a breach by GMI was for Rocket Dog to terminate the agreement. Thus, Section 9.3 provides that with

---

[7] It should be noted that GMI's counterclaims against Rocket Dog, sounding in fraud and intentional torts, are not precluded by Section 11.2 because, pursuant to Civil Code § 1668, "[a]ll contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." "Under this section, a party may not contract away liability for fraudulent or intentional acts or for negligent violations of statutory law." *Blankenheim v. E.F. Hutton & Co., Inc.*, 217 Cal. App. 3d 1463, 1471-72 (Cal. Ct. App. 1990).

respect to "breaches [of] any material term or condition of this Agreement—other than a breach of any requirement to meet Minimum Sales—Rocket Dog Brands may elect to give Distributor written notice of such breach… detailing the steps necessary to cure," and if GMI does not cure "within forty five (45) days from the effective date of such notice, the notice of termination becomes effective on that 45th day." (Agreement at § 9.3, Maroni Decl. Ex. A). While Section 9.3 excludes "a breach of any requirement to meet Minimum Sales" from a cure period, such a breach also could result only in termination of the Agreement limited to the affected product category. That follows from Section 4.1(c), which states that

> [i]f Distributor fails to meet the requirements of Section 4.1(a) [obligating GMI to meet Minimum Sales or at least pay the Yearly Royalty Payment]… at any time after the end of the applicable calendar year, Rocket Dog Brands may in its sole and absolute discretion elect to terminate Distributor's licenses and distributorship under this Agreement regarding the Product Category for which the mentioned requirements were not met.

(*Id.* at § 4.1(c)).

Termination of the Agreement is precisely what Rocket Dog elected to do. As agreed to in the Agreement, that is its only remedy, and no additional damages are available to it.[8] Indeed, the parties' waiver of damages wholly safeguarded Rocket Dog's interests. While GMI put in time, efforts, and resources to develop and market products incorporating Rocket Dog's trademarks, Rocket Dog's only affirmative responsibility was to allow the use of its trademarks. Upon Rocket Dog's election to terminate, GMI would be saddled with costs and efforts it could not recoup, while Rocket Dog would be free simply to license its trademarks to someone else, and be no worse off. Having agreed to preclude damages, Rocket Dog has no basis to them, and summary judgment is properly entered dismissing its claims not based on the Accelerated Royalties Provision for lack of damages. *Caza Drilling, supra* (affirming award of summary judgment on damages claims precluded by contract).

---

[8] To be clear, GMI does not contend that Section 11.2 abrogates any payment obligations expressly set forth in the Agreement that were due or owing prior to termination. Thus, as for minimum royalties or advertising expenditure payments not made and owing to Rocket Dog under the terms of the Agreement for 2011 and the first half of 2012 (before the June 21, 2012 termination date), GMI has made an offer of judgment in those amounts under Federal Rule of Civil Procedure 68.

## CONCLUSION

Accordingly, for the reasons set forth above, GMI respectfully requests that the Court grant summary judgment in its favor on Rocket Dog's claims, and any further relief it deems appropriate.

DATED:   July 12, 2013               GREENBERG TRAURIG, LLP


                                     By: ___/s/ Sarah Barrows_____
                                         SARAH E. BARROWS (SBN 253278)
                                         barrowss@gtlaw.com
                                         GREENBERG TRAURIG, LLP
                                         4 Embarcadero Center, Suite 3000
                                         San Francisco, CA 94111-5983
                                         Tel: (415) 655-1300
                                         Fax: (415) 707-2010

                                         *Attorneys for Defendant*
                                         GMI USA CORPORATION